IN THE
UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| DISENIA CANCEL and ISMAEL CANCEL, | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) No. 08 C 951 |
| v. | ) |
| | ) |
| CITY OF CHICAGO and JODY WEIS, | ) Honorable Milton Shadur, |
| SUPERINTENDENT of POLICE, | ) Presiding |
| **Defendants** | ) |

## EXHIBIT 1 IN SUPPORT OF PRELIMINARY INJUNCTION

1



# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

DESNIA CANCEL and ISMAEL CANCEL, )
)
            Plaintiffs, )
)     No. 08 C 951
     vs. )
)
CITY OF CHICAGO and JODY WEIS, )
Superintendent of Police, )
)
            Defendants. )

 

The deposition of KRISTINE HADAC, called by the Plaintiffs for examination, taken pursuant to notice and pursuant to the Federal Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, taken before Sharon Valli, Certified Shorthand Reporter and Notary Public, at 407 South Dearborn Street, Suite 1675, Chicago, Illinois, commencing at 10:06 a.m. on the 24th day of July, A.D., 2008.

**JENSEN REPORTING**
205 West Randolph Street, Suite 610
Chicago, Illinois 60606
Phone: (312) 236-6936
Fax: (312) 236-6968



1          And, lastly, even though it's common for people

2    to shake their head up and down for yes or left to right

3    for no, the court reporter is supposed to take down

4    words.  So you answer in words, and I'll try to ask

5    questions using words rather than gestures or nods.

6    Okay?

7          A.    Yes.

8          Q.    Can you state your name for us?

9          A.    It's Kristine, K R I S T I N E, Hadac,

10   H A D A C.

11         Q.    And by whom are you employed?

12         A.    Chicago Police Department, City of Chicago.

13         Q.    Okay.  Are you a police officer?

14         A.    Yes.

15         Q.    And for how long have you been a police

16   officer?

17         A.    22 years.

18         Q.    And where are you currently assigned?

19         A.    Unit 168.

20         Q.    What is Unit 168 do -- Was does Unit 168 do?

21         A.    Unit 168 is auto pound headquarters.

22         Q.    Where is the auto pound headquarters?

23         A.    650 West 83rd Street in Chicago.

24         Q.    How long have you been assigned to Unit 168?

6

1    A.    Since August of 2000.

2    Q.    So roughly the last 8 years -- almost 8 years?

3    A.    Yes.

4    Q.    Before that, what was your assignment?

5    A.    Before that, I was secretary to the chief of

6    patrol.

7    Q.    And where was that assignment?

8    A.    At Roosevelt and State Street.

9    Q.    At the former police headquarters?

10    A.    Yes.

11    Q.    Before it moved to roughly 35th and Michigan?

12    A.    Yes.

13    Q.    And how long did you have that job?

14    A.    From '98, so 2 years.

15    Q.    2 years?

16    A.    Yes.

17    Q.    And what was the assignment immediately before

18    that?

19    A.    Secretary to the district commander of the

20    10th District.

21    Q.    Where is the 10th District?

22    A.    It was at 21st and Damen.

23    Q.    It's moved, I take it?

24    A.    Yes.

1    Q.    Where is it now?

2    A.    Roughly Ogden and Kedzie.

3    Q.    And how long did you hold that position?

4    A.    I have to think.

5    Q.    Approximately is fine.

6    A.    10 years.

7    Q.    Okay.  So those three assignments account for

8    the vast majority of the time you've been a police

9    officer?

10    A.    Yes.

11    Q.    Can you tell me briefly what your educational

12    background is?

13    A.    Some college.

14    Q.    And where did you attend college?

15    A.    The Art Institute, University of Chicago, Daley

16    College, and Columbia College.

17    Q.    That's an interesting mix.

18    A.    Yes.

19    Q.    Did any of those college courses include any

20    legal training?

21    A.    Some courses that we received when we were in

22    the police academy touched on legalities.

23    Q.    Okay.  Leaving out the police academy, did any

24    of your college level courses touch on legal issues?

8

1    A.    No.

2    Q.    And the time when you were in the police

3    academy was roughly 20 some years ago?

4    A.    Yes.

5    Q.    Other than the time you were in the police

6    academy, did you have any other specific legal training?

7    A.    No.

8    Q.    Before you were assigned to Unit 168, did you

9    have any -- Or excuse me.  Once you were assigned to

10    Unit 168, did you get any specific legal training with

11    respect to, say, towed cars?

12    A.    I was told verbally of the policies.

13    Q.    Who advised you verbally of the policies?

14    A.    Officer Waliczek.

15    Q.    Can you spell Waliczek for us?

16    A.    W A L I C Z E K.

17    Q.    And is Officer Waliczek still a police officer?

18    A.    No.

19    Q.    Did he retire?

20    A.    Yes.

21    Q.    Do you remember when he retired approximately?

22    A.    3 years ago.

23    Q.    And when Officer Waliczek informed you orally

24    of the policies, to the best of your recollection, what

1  did he tell you?

2      A.   Oh, my God.  That would be a lot to go through.

3      Q.   Okay.  Well, how about if we limit it to towed

4  cars?

5      A.   There's a process.  When the vehicle comes into

6  the pound, that's filled out.  And then what happens

7  while the vehicle is there, the length of stay, how the

8  vehicles are released, and how they are charged.

9      Q.   Did Officer Waliczek inform you of the method

10  in which any hearings might be held?

11      A.   Yes.

12      Q.   And what advice or information did he give you

13  with respect to hearings?

14      A.   The only thing we do a hearing for is to decide

15  the legality of the tow.

16      Q.   Is that what he told you?

17      A.   Yes.

18      Q.   In addition to what he told you, did you --

19  were you provided with any specific police department

20  directives or general orders relating to tow hearings?

21      A.   I was told of them.  I was not handed them.

22      Q.   Did you read them at that time or subsequent?

23      A.   No.

24      Q.   Okay.  It was, therefore, I assume, your

1 understanding that what Officer Waliczek told you was an

2 accurate rendition of the written directives or orders?

3  A. Yes.

4  Q. You didn't have any reason to doubt that?

5  A. No.

6  Q. Did you receive any oral advice or information

7 subsequent to Officer Waliczek's conversations with you

8 concerning tow hearings?

9  A. No.

10  Q. Okay.  Would it be fair to say that you --

11 Well, let me ask -- Let me stop that.  What are your

12 duties at -- now with respect to this unit of assignment?

13  A. I do all timekeeping procedures.

14  Q. What is a timekeeping procedure?

15  A. Listing who works.  If they are not there

16 present for duty, why not.  If they worked overtime, if

17 they worked holidays, they get any extra pay.

18  Q. Okay.

19  A. Also, typing up all to/from correspondence to

20 different commanders and supervisors.

21  Q. And what kind of information would be in these

22 to/froms, just routine day-to-day stuff or something

23 special?

24  A. It depends.

1    Legal Affairs, a couple of their names?

2          A.    Matt Brady, B R A D Y.

3          Q.    Okay.

4          A.    Kim Stewart, S T E W A R T.  Officer Fahey,

5    F A H E Y.  Officer Paluch, P A L U C H.

6          Q.    Okay.

7          A.    That's a few.

8          Q.    Okay.  In addition to the activities you've

9    already mentioned, do you perform any other tasks for the

10   City?

11         A.    Yes.

12         Q.    What would that be?

13         A.    I would handle the files for the vehicles towed

14   in for Article 36 with regards to a driver having a

15   license suspended or revoked for DUI.

16         Q.    And what's your understanding of what

17   Article 36 is?

18         A.    The vehicle was involved in a crime and is

19   eligible for a seizure.

20         Q.    And is it also eligible for forfeiture?  Is

21   that part of your understanding?

22         A.    Yes, seizure, forfeiture.

23         Q.    So you -- I think you just said you handle like

24   the paperwork.  Is that how you put it?

1    A.    Yes.

2    Q.    What paperwork would that be?

3    A.    The complete file.

4    Q.    What would be in a file, a typical file?

5    A.    The motor vehicle inventory report.  The tow

6    report.  The registration from the State, that

7    information.  The file from the officer who initiated the

8    tow.

9    Q.    Okay.  So you maintain those records, make sure

10    that you have what you need in the file for a specific

11    vehicle?

12    A.    Yes.

13    Q.    In addition to that, are you involved in any

14    hearing process?

15    A.    Only if the hearing officer is not available.

16    Q.    Who is the hearing officer usually?

17    A.    Right now it's Robert Crane.

18    Q.    C R A N E?

19    A.    Yes.

20    Q.    Is Robert Crane a police officer?

21    A.    Yes.

22    Q.    How long has Robert Crane been handling

23    Article 36 hearings to your knowledge?

24    A.    Officer Crane is the hearing officer for any

1    hearing since March of this year.

2         Q.    Before March of this year, who did that?

3         A.    Brian Martinez, a police officer who is now a

4    detective.

5         Q.    Okay.  Is either Officer Crane or

6    Officer Martinez an attorney to your knowledge?

7         A.    No.

8         Q.    Before Officer -- How long did Officer Martinez

9    do the hearings?

10        A.    Approximately -- Between 2 and 3 years.  I'm

11   not exactly sure of the dates.

12        Q.    Okay.  So if either Officer Martinez or

13   Officer Crane were not available and a hearing was

14   supposed to be held, you would be the, like, substitute

15   hearing officer?

16        A.    Myself or Officer Pye, P Y E.

17        Q.    Okay.  Are there any other people, say, in the

18   last 5 years who have been hearing officers?

19        A.    Officer Waliczek.

20        Q.    Okay.

21        A.    And Officer Ficaro, F I C A R O.

22        Q.    Would that cover everyone that you can think of

23   who have been hearing officers?

24        A.    (No verbal response.)

1    Q.   I mean, I realize we're going back a period of

2  time, maybe you forgot somebody.  But does that seem like

3  a complete list?

4    A.   That's a complete list other than the chief of

5  our unit.  If we have a question regarding a hearing, we

6  would have him clarify it.

7    Q.   Who is the chief of your unit?

8    A.   Kenneth Kudulis, K U D U L I S.

9    Q.   It's good that you can spell all these.

10    A.   Yes.

11    Q.   Okay.  How often are these Article 36 tow

12  hearings held?

13    A.   It depends.

14    Q.   Let's say in an average week.  Would there be

15  one a week or more than one a week?

16    A.   It depends on what Article 36 hearings you're

17  talking about.

18    Q.   Okay.  What are the -- Are there different

19  Article 36 hearings?

20    A.   Yes.

21    Q.   Can you describe the difference for me?

22    A.   There's the one set of Article 36 vehicles that

23  are towed for a person driving on a suspended or revoked

24  driver's license.  And there's a whole different set that

1    are towed because they are involved in another crime such

2    as a burglary.

3        Q.    Okay.  Let's stick with the Article 36 hearings

4    related to traffic offenses, not burglaries or other

5    serious felonies like that.  Okay?

6        A.    Yes.

7        Q.    With respect to the traffic-related Article 36

8    hearings, how often do those occur in a week, say?

9        A.    We could have none, one.  We don't have that

10   many vehicles.

11       Q.    Would you say over the course of your years

12   there there's been one hearing per week on average?

13       A.    I'm not sure.  Are you just talking about the

14   Article 36?

15       Q.    Just Article 36 traffic, not -- You know,

16   you've distinguished --

17       A.    Right.

18       Q.    -- traffic from other criminal activity,

19   correct?

20       A.    Yes.

21       Q.    So if we just talk about for this moment

22   Article 36 tow hearings related to traffic violations,

23   would you say that on average there would be one per week

24   over the course of the year?

1    A.    Yes.

2    Q.    In your personal experience, how many

3    Article 36 hearings would you do in a year that are not

4    traffic related, that are like burglaries, robberies?

5    A.    We don't do hearings on those.

6    Q.    Okay.  Why not?

7    A.    Because they are currently going through court.

8    If someone calls, we tell them to contact the detective

9    on that case.

10    Q.    Okay.  Just so I understand this, if a

11    person -- we'll call him Mr. X -- had a car seized

12    because he allegedly participated in a burglary and he

13    called -- say he got out on bond on a criminal case, and

14    he called and said, "I want to get my car back," your

15    response would be, "You have to contact the officer who

16    arrested you"?

17    MS. JACKSON:  Objection as to form.

18    You can answer if you know.

19    BY THE WITNESS:

20    A.    If the case was over --

21    Q.    Well, let's say the case is still going on.

22    A.    Still going --

23    Q.    The criminal case.

24    A.    Okay.  He would be told to contact the

1  detective that's handling his case.

2      Q.  And he, as far as you know, could not have a

3  hearing from you or these other people you've mentioned

4  while his criminal case was pending?

5      A.  Correct.

6      THE WITNESS:  Can I clarify something I said

7  earlier?

8      MR. PETERS:  It's okay with me.

9  BY THE WITNESS:

10      A.  The hearings on the Article 36 for traffic only

11  happen if the vehicle is off hold.

12      Q.  Okay.

13      A.  If it has gone to the Sheriff's Office, we

14  don't do hearings.

15      Q.  Okay.  Well, I'll go back to that.

16      A.  Okay.

17      Q.  But with respect to a person who has a

18  nontraffic criminal case pending, the process as you

19  understand it is if that person requested a hearing -- an

20  Article 36 hearing from you, he would not be entitled to

21  one?

22      A.  Correct.

23      Q.  Okay.  Now, to go back with the point you were

24  clarifying, can you describe for me the process for

1      getting one of these Article 36 hearings in a nontraffic

2      case -- I mean, excuse me, in a traffic-related case?

3          A.   To receive a hearing in a case where the

4      vehicle was towed for an Article 36 because the driver

5      was driving while his license was suspended or revoked

6      for a previous DUI conviction, if all the paperwork was

7      received within 30 days, it would be sent to the

8      Sheriff's Department and, therefore, the owner of the

9      vehicle would have to contact the Sheriff's Department.

10         Q.   Okay.

11         A.   If the Sheriff's Department received all the

12     paperwork from us and declined to pursue forfeiture, the

13     hold would be taken off the vehicle.  And at that time,

14     the owner would be eligible to have a hearing.

15         Q.   Okay.  So in dealing with only these

16     traffic-related Article 36 cases, a person can get a

17     hearing from you or one of the other people you've

18     mentioned once all of the police department paperwork is

19     in and the sheriff has declined to seek forfeiture; is

20     that right?

21         A.   Yes.  Or if all the paperwork was not received

22     within 30 days from the officer.

23         Q.   All right.  So does it typically take around

24     30 days to get all the paperwork?

1     A.   No.

2     Q.   How long does it typically take to get all the

3 paperwork?

4     A.   About a week.

5     Q.   So in a typical case, after a week, the

6 paperwork necessary to forward the information to the

7 sheriff would be in?

8     A.   Yes.

9     Q.   Who is responsible for getting that paperwork

10 from CPD to the sheriff?

11     A.   Normally myself.

12     Q.   And after you have the paperwork in your

13 possession, how long does it usually take you to get it

14 to the sheriff?

15     A.   The next day.

16     Q.   How do you send it to the sheriff, by mail, by

17 fax, by computer?

18     A.   By another officer in the unit.

19     Q.   So you -- There's like a courier who picks up

20 the paperwork?

21     A.   No.

22     Q.   Okay.  Can you explain how the process works?

23     A.   An officer assigned to our unit who does

24 confidential investigations at the pound on 103rd and

1    Dody (phonetic) will go out that way.  The Sheriff's

2    Office is on 103rd just off of the expressway, so he

3    drops it off.

4        Q.    How often does he come by your location, which

5    I think you said was on 83rd Street, right?

6        A.    Yes.  Every day.

7        Q.    So every day this officer stops by your

8    location.  And if you have completed paperwork on a

9    particular seized vehicle, you give it to this officer

10    who takes it to the sheriff?

11        A.    Yes.

12        Q.    Then how -- Well, first of all, is there a

13    specific officer who usually does this now, who usually

14    picks up the paper?

15        A.    Yes.

16        Q.    What's his or her name?

17        A.    Officer Bland B L A N D.

18        Q.    Do you know Officer Bland's first name?

19        A.    Yes, Walter, W A L T E R.

20        Q.    And how long has Officer Walter Bland been

21    performing this service for the CPD?

22        A.    As long as I've been doing this.

23        Q.    Okay.  So going back roughly 8 years?

24        A.    We didn't have Article 36 seizures for persons

23

1  driving while their license was revoked or suspended for

2  a DUI conviction 8 years ago.

3      Q.    When did you start doing that, roughly?

4      A.    Probably after '03, 2003.  I don't remember

5  exactly when that law was passed.

6      Q.    Okay.  But approximately 5 years -- 4 or

7  5 years?

8      A.    Yes.

9      Q.    And during that 4- or 5-year period,

10 Officer Bland has been the person who would stop by your

11 location, pick up the completed CPD paperwork, and then

12 take it to the sheriff?

13     A.    Yes.

14     Q.    After Officer Bland does that for a given

15 vehicle, how long does it usually take the sheriff to get

16 back to you or someone at your location as to whether the

17 sheriff has decided to pursue forfeiture or decline?

18     A.    It's definitely within a week, sometimes within

19 a day.

20     Q.    Okay.  So using those estimates, in a typical

21 case, CPD would know whether the sheriff was going to

22 seek forfeiture or going to decline within 2 weeks, maybe

23 a little less --

24     A.    Yes.

1     Q.    -- of the forfeiture -- I mean, of seizure?

2     Excuse me.

3     A.    Yes.

4     Q.    In the case where the sheriff declines, what's

5     the next step in the process?

6     A.    The vehicle is taken off hold, and a letter is

7     sent out to the owner telling them the vehicle is

8     eligible to be redeemed by the owner.

9     Q.    Okay.  Is it correct then that until that

10    letter is sent out there is no Article 36 hearing?

11    A.    Correct.

12    Q.    Once the letter is sent out -- Well, let me

13    back up.  Who sends the letter out notifying the person

14    that the hold has been released and now they can reclaim

15    their vehicle or have a hearing or both?

16    A.    When a hold is taken off of a vehicle, the top

17    form, the motor inventory report, is marked with an HO

18    meaning the hold is off.  And then the file is put into a

19    basket where the typist takes it out and prepares the

20    letter to be mailed.  And the operations office is

21    notified the vehicle is no longer on hold and may be

22    released.

23    Q.    Okay.  If I understand you correctly so far,

24    you make sure that the paperwork is complete for

1      A.   If I'm not there, it could be directed to

2   Officer Crane or Officer Pye.

3      Q.   Okay.  And then once you or Officer Crane or

4   Officer Pye have seen this communication from the sheriff

5   and assuming it is that "we declined to seek forfeiture,"

6   then one of the three of you notifies the typist to send

7   out the letter; is that right?

8      A.   Well, the file is marked as taking the hold

9   off, and it is put in a bin.

10      Q.   A bin.

11      A.   And then she would normally take it the next

12   day and type up a letter to send out.

13      Q.   Okay.  In a typical week, how many cars come in

14   pursuant to Article 36 holds?

15      A.   All Article 36?

16      Q.   Just traffic related.

17      A.   We usually only have about six a year.

18      Q.   For traffic related, six total cars?

19      A.   Yes.

20      Q.   Okay.  And with respect to nontraffic related,

21   how many do you get?

22      A.   I don't have the figures on that.  I don't keep

23   those.

24      Q.   Would it be more or less?

1　　A.　　More.

2　　Q.　　A lot more?

3　　A.　　Yes.

4　　Q.　　A hundred in a year?

5　　A.　　I don't have a figure.

6　　Q.　　Okay.　Well, I know that you don't have the

7　figures.　And I'm certainly not holding you to any

8　specific figure, but you've been there for years.　What's

9　your sense of how many come in in total?

10　　A.　　Maybe -- I don't really know.　Maybe between

11　20 or 30 percent of the total amount of cars there, all

12　Article 36.　I'm only making a guess because I don't keep

13　those figures.

14　　Q.　　Right.　But I don't know.　20 or 30 percent of

15　what?

16　　A.　　Off all the cars that are brought into the

17　pound.　I can't give you specifics because I don't keep

18　those figures.

19　　Q.　　I understand that.　And believe me -- I

20　understand that.　I'm just trying to get a general feel

21　for things.　Okay?　How many cars come into the pound in

22　a week for whatever reason, a thousand?

23　　MS. JACKSON:　On average?

24　　MR. PETERS:　Yeah, on average

1  BY THE WITNESS:

2      A.   On average, we have a thousand there at any one

3  time; that's with cars coming in and cars going out.  But

4  actually how many come in every week, that's not

5  something that I keep.  I don't keep those figures.

6      Q.   So when you said 20 to 30 percent, you were

7  saying 20 to 30 percent of the total number of vehicles

8  towed into the pound in any given week might be

9  Article 36 related if you include nontraffic cases?

10     A.   That could be.

11     Q.   Okay.  Going back to the procedure, once the

12  typist has the notice from the sheriff saying it's

13  declined, the typist sends out basically a form letter,

14  correct?

15     A.   Yes.

16     Q.   To the last known address of the vehicle owner?

17     A.   To the address that we received from the State

18  of Illinois.

19     Q.   Okay.  So the address -- If the driver of the

20  vehicle was the owner of the vehicle and he said, "I live

21  at 1234 Dearborn," but it was registered to the same

22  person at 1234 LaSalle, it would be sent to the LaSalle

23  address?

24     A.   It would be sent to both.

1      Q.   It would be sent to both.  Okay.  Then that

2  person can come in and reclaim the car or have a hearing?

3      A.   Correct.

4      Q.   If the person came in and said I want to have a

5  hearing, could they first get the car out and then have

6  the hearing?

7      A.   They can have a post-tow hearing, I think -- I

8  believe it's within 15 days after the vehicle is

9  released.  I'm not clear on that.

10     Q.   Okay.  But what I'm asking is this -- Actually,

11 let me ask a different question.  Once the car is towed

12 in, are towing and storage charges applied to that car?

13     A.   Yes.

14     Q.   And what's the daily storage charge right now?

15     A.   It's $10 per day for the first 6 days.  And

16 beginning with the 7th day, it's $35 a day.

17     Q.   And then it continues at 35 until the car is

18 redeemed?

19     A.   Correct.  That's for vehicles that are under

20 8,000 pounds.

21     Q.   Which would be a typical vehicle, correct,

22 something smaller than a truck or a very large car?

23     A.   Yes.

24     Q.   Okay.  So those charges are accumulating each

1    day.  And there's a towing fee also, correct?

2        A.    Yes.

3        Q.    What's the current towing fee?

4        A.    $150.

5        Q.    Okay.  So I'm not going to do the exact math.

6    But let's say --

7        A.    Excuse me.  I have to go back.  It's starting

8    with the sixth day it's $35 a day.

9        Q.    I'm not going to try to do the exact math.  But

10   let's say after 10 days the person owes -- they would owe

11   about 350 bucks, right?

12       A.    No.

13       Q.    How much would they owe?

14       A.    If the vehicle is there for a regular

15   investigation, it's held 10 days, released on the

16   eleventh day, it's $410.

17       Q.    $410?

18       A.    Yes.

19       Q.    Okay.  That's why I shouldn't have tried to do

20   the math in my head.  So let's say that you get this

21   letter, the sheriff has declined, and it's sent to the

22   owner around the tenth or eleventh day.  The owner

23   probably gets it a day or two later.  So now we're at

24   12 or 13 days since the seizure, so it's above the 410

1   number.  My question then is this:  Can the owner come in

2   and say, "Okay.  Here's what I owe you.  I want to get my

3   car out now.  But I also want to have a hearing because I

4   really don't think I should pay you anything."

5           A.    They can have a hearing right then before they

6   pay.

7           Q.    Can they -- Okay.  But can they do -- Do they

8   have the option of paying and doing the hearing later?

9           A.    They can.

10          Q.    So they can get the car out and have the

11  hearing later?

12          A.    Yes.

13          Q.    And if they had the hearing after they got the

14  car out and they won the hearing, then what would happen?

15          A.    They would get a refund.

16          Q.    Okay.  Now, during the time that you're waiting

17  for an answer from the sheriff, is any written notice

18  sent to the car owner?

19          A.    Every vehicle upon being brought into the pound

20  and receiving an inventory number has a letter sent out

21  to the owner letting them know that the vehicle is in the

22  pound and why it's there.

23          Q.    Okay.

24          MR. PETERS:  So why don't we -- This, we'll mark as

1    Deposition Exhibit 1.

2                    (Hadac Deposition Exhibit No. 1

3                    marked as requested.)

4        MS. JACKSON:  Can we take a brief break whenever in

5    the next few minutes?  I'm sorry.

6        MR. PETERS:  Yeah.  We can do it right now.

7                    (A short break was had.)

8    BY MR. PETERS:

9        Q.   Officer, you have in front of you what's been

10   marked as Exhibit No. 1.  First of all, do you recognize

11   what this is in general?

12       A.   Yes.

13       Q.   Is this a typical notice letter that is sent

14   out shortly after the vehicle is seized and impounded?

15       A.   For Article 36 cases, yes.

16       Q.   Okay.  And has this particular form been in use

17   for some time now?

18       A.   Yes.

19       Q.   Can you tell me for approximately how long it's

20   been in use?

21       A.   Since I came to this unit, before.

22       Q.   Okay.  The one that you have in front of you

23   already has an exhibit sticker that says Cancel No. 3.

24   Do you see that?

1    A.    Yes.

2    Q.    With respect to this one, it apparently was

3  sent to Disenia Cancel; is that correct?

4    A.    Yes.

5    Q.    And at the top of this, there is a date towed

6  of January 4th, 2008?

7    A.    Correct.

8    Q.    And there's a date -- Above that, there's

9  something labeled date and it's January the 7th, 2008.

10  Is that the date on which this was mailed?

11    A.    It's the date on which this was typed.

12    Q.    Okay.  So it might have been mailed on the 7th

13  or the 8th?

14    A.    Correct.

15    Q.    Okay.

16    A.    I would like to clarify that.  On the 7th or

17  8th, it is sent to the mail unit for the police

18  department.  I don't know how long they take to send the

19  stuff out.

20    Q.    Okay.  So how does it get from your location to

21  the police department's mail unit, by a courier for pick

22  up?

23    A.    It's picked up everyday.

24    Q.    All right.  So it's picked up from your

34

1    location.  Do you know where the mail unit is located?

2        A.    At 35th and Michigan.

3        Q.    The headquarters?

4        A.    Yes.

5        Q.    So then it's taken to the headquarters.  And at

6    some point in time, presumably shortly thereafter, it's

7    mailed by them?

8        A.    Yes.

9        Q.    So when you -- When your location puts this

10   letter out to be picked up, is it in a stamped addressed

11   envelope or is it just the letter itself with no

12   envelope, no stamp?

13       A.    The letter is placed in a window envelope, and

14   it has a certified mail sticker attached to it.  And

15   there is a listing for all the certified letters that are

16   in the bundle.  And it's a listing with each name and

17   address on that form.  And it's attached around the

18   bundle of mail that goes to the post office.  And when

19   the post office receives it, they stamp that and mail it

20   back to us acknowledging receipt of the mail -- the

21   certified mail.

22       Q.    Okay.  Now, you notice in the second paragraph

23   under the heading "Vehicle on Hold" it says at one point,

24   quote, "You may call the Article Officer at

1    (312) 747-0941?  Do you see that?

2        A.    Yes.

3        Q.    Is that the -- Is that a phone number that's

4    located at the location where you're stationed?

5        A.    Yes.

6        Q.    And are there specific people at your location

7    who answer that phone?

8        A.    Everyone in our office answers the phones.

9        Q.    Okay.  So if somebody called that number, they

10   might get someone who is not an article officer?

11       A.    Yes.

12       Q.    Because the only article officers are yourself,

13   Officer Crane, and Officer Martinez?

14       A.    No.

15       Q.    Who else -- Of that whole list, there are

16   still ...

17       A.    In our office, there's three officers.  Each

18   officer has a different designation.  I'm designated as

19   the article officer.

20       Q.    All right.  What are the other two, Martinez

21   and Crane, designated as?

22       A.    Martinez is no longer with us --

23       Q.    Okay.

24       A.    -- because he was made detective.  Officer

36

1    Crane took his place.

2        Q.    What's his designation?

3        A.    Officer Crane is designated as the hearing

4    officer and Officer Pye is designated as the auction

5    officer.

6        Q.    Okay.

7        A.    But we fill in for whoever when they're not

8    present. We fill in for each other.

9        Q.    Okay. I guess that's what I misunderstood. So

10   there are specific designations for each of you; but if

11   one person was missing, another one could fill that other

12   person's function?

13       A.    Yes.

14       Q.    Okay. So if, however, a person calls the

15   designated number and asks for the article officer, they

16   would be referred to you?

17       A.    They would be asked what it is in regards to.

18       Q.    And if they say, "My car was towed, and I'm

19   calling because I got this notice," would they then be

20   referred to you?

21       A.    No. They would ask if they could help them.

22       Q.    Okay. And what kind of information would this

23   person who had answered the phone give the caller?

24       A.    He would first ask them if they have an

1    A.    The chief and two civilians.

2    Q.    Okay.  So in a typical shift, how many people

3    are usually there?

4    A.    The three police officers, the chief auto pound

5    supervisor, and the two civilians.

6    Q.    So six?

7    A.    Yes.

8    Q.    And any one of the six could answer the phone?

9    A.    Yes.

10    Q.    And if any one of the six answered the phone,

11    the typical process would be to first go get the file?

12    A.    Yes.

13    Q.    And if the person went to get the file and

14    there was no -- the hold had not been released, does

15    everyone who is working there know that you can't have a

16    hearing then?

17    MS. JACKSON:  Objection as to form.

18    BY THE WITNESS:

19    A.    It depends on what vehicle they are calling on.

20    Every one is different.

21    Q.    If it's an Article 36 vehicle, for whatever

22    reason, traffic or nontraffic, and the hold has not been

23    released by the sheriff, you can't have a hearing yet,

24    right?

1    A.    Yes.

2    Q.    So if a person called before the hold had been

3  released by the sheriff, that person would be informed

4  that they have to wait until the hold is released?

5    A.    If it was the two civilians that had the file,

6  they would give it to one of the police officers.

7    Q.    And one of the police officers would then

8  inform the caller that they would have to wait until the

9  hold had been released?

10    A.    Yes.

11    Q.    Because nothing can happen with an Article 36

12  car until the hold has been released?

13    A.    They could be told they can go to court and get

14  a court order to order us to release it to them.  They

15  are allowed to do that.

16    Q.    They can?

17    A.    Yes.

18    Q.    Do you tell them that?

19    A.    Yes.

20    Q.    Is there something that tells them that in

21  writing?

22    A.    No.

23    Q.    Has there ever been something that told them

24  that in writing?

1      A.   No.

2      Q.   Has that ever happened?

3      A.   I don't understand your question.

4      Q.   Has it ever happened that within 2 weeks of a

5  seizure for an Article 36 car, you received a court order

6  saying release it?

7      A.   Not within 2 weeks.

8      Q.   Within 30 days?

9      A.   Yes.

10     Q.   How often in the 8 years that you've been

11  roughly has that happened?

12     A.   Maybe four or five times.

13     Q.   Did the City honor the order?

14     A.   Yes.

15     Q.   When they call and you do -- Do all of you

16  always tell them they can get a court order?

17     A.   Yes.

18     Q.   And do all of you tell them how to get a court

19  order?

20     A.   No.  We tell them to contact their attorney.

21     Q.   Okay.  Do you say -- Do you refer them to a

22  City ordinance?

23     A.   No.

24     Q.   Do you refer them to the statute?

1      A.    No.

2      Q.    Do you know whether there's any City ordinance

3  or statute that allows for such a court order?

4      A.    No.

5      Q.    Have you -- Have you personally read

6  Article 36, the statute?

7      A.    Most of it.

8      Q.    Okay.  I think I've asked you this, but just

9  make this clear for me.  Exhibit No. 1 is the only

10  written communication that is given to a car owner

11  between the time the car is seized and the hold is

12  released by the CPD?

13      MS. JACKSON:  You're talking about Article 36

14  traffic violations?

15  BY MR. PETERS:

16      Q.    Article 36 cars.

17      A.    Yes.

18      Q.    If a person went to your location, are there --

19  would he or she be able to see any posted notices other

20  than Exhibit No. 1 for Article 36 cars?

21      A.    No.

22      Q.    Are you aware of any posted notices maintained

23  anywhere in the City of Chicago by the police department

24  advising car owners of their rights when their car is

1    seized for Article 36 purposes?

2         A.   I can only respond to our unit.  Our unit

3    doesn't have anything posted.  I can't respond to

4    anywhere else.

5         Q.   Okay.  Well, have you heard of it being posted

6    anywhere else?

7         A.   No.

8         Q.   Have you been to the new headquarters at

9    35th and Michigan?

10        A.   Yes.

11        Q.   When you've been there, did you ever see any in

12    the lob- -- any such notices in the lobby?

13        A.   No.

14        Q.   To your knowledge, does the sheriff provide any

15    additional notice besides what you provide?

16        A.   (No verbal response.)

17        Q.   Just to make it clear, I'm only talking about

18    Article 36 cars.

19        A.   The only thing that I'm aware of is that

20    verbally I was told if it is going to go to court, a

21    notice is sent to the owner by them.

22        Q.   Okay.

23        A.   Other than that, I have no knowledge.

24        Q.   All right.  So would it be correct to say then

1    that, to the best of your knowledge, after a car is

2    seized but before the hold is released, the car owner

3    does not receive a written notice that tells him when a

4    hearing will be held or can be held?

5         A.   I don't understand that question.

6         Q.   Okay.  Speaking only about Article 36 cars and

7    only between the time the car is seized but before the

8    hold is released by the sheriff -- that's the

9    parameters -- using that as a guide, to your knowledge,

10   does the CPD issue any written communication to the car

11   owner as to when a hearing can be held?

12        A.   By seized, could you clarify what you mean by

13   that?

14        Q.   An impounded Article 36 car?

15        A.   Okay.  No.

16        Q.   Does the CPD issue any written communication,

17   using the same parameters, as to where the hearing will

18   be held -- a hearing can be held?

19        A.   No.

20        Q.   Or who will be present for the hearing?

21        A.   No.

22        Q.   Or what rights you have at the hearing?

23        A.   No.

24        Q.   Okay.  With respect to the person identified in

1    Exhibit No. 1, Disenia Cancel, do you recall her at all?

2        A.   Yes.

3        Q.   Do you recall seeing her?

4        A.   No.

5        Q.   Do you recall getting phone calls from her?

6        A.   I recall one phone call from her.

7        Q.   Okay.  Do you recall when approximately that

8    phone call was received, what day or month?

9        A.   It was the day that she asked for a hearing.

10       Q.   Okay.

11       MR. PETERS:  Well, we'll mark this as Exhibit No. 2.

12                      (Hadac Deposition Exhibit No. 2

13                      marked as requested.)

14   BY MR. PETERS:

15       Q.   Do you recognize what Exhibit No. 2 is?

16       A.   Yes.

17       Q.   And what would you describe this as being?

18       A.   A post-tow hearing form.

19       Q.   Is this the same form that's been in use by the

20   CPD for several years?

21       A.   Yes.

22       Q.   Has this form been in use by the CPD as long as

23   you've been assigned to Unit 168?

24       A.   Yes.

1   Q.   Did you personally prepare this one?

2   A.   Yes.

3   Q.   Does this one relate to Disenia Cancel?

4   A.   Yes.

5   Q.   And it includes a date of February 6th, 2008,

6   correct?

7   A.   Yes.

8   Q.   Does that refresh your recollection as to when

9   she first called about her car as far as you know?

10   A.   I don't know when she first called.

11   Q.   The first time you spoke to her was on

12   February 6th, 2008?

13   A.   As far as I can recall, yes.

14   Q.   Did you ever speak to an attorney calling on

15   her behalf before that date?

16   A.   Yes.

17   Q.   Do you recall that person's name?

18   A.   I believe it was Robert Cotter, C O T T E R.

19   That's how I spelled it.

20   Q.   Okay.  How many times before the date on this

21   Exhibit No. 2 did you speak to Mr. Cotter?

22   A.   I only remember speaking to him one time.

23   Q.   And do you recall approximately when that was?

24   A.   Sometime not too far after the vehicle was

1    impounded. Not too long after it was impounded. I don't

2    remember the exact date.

3        Q.    Did he speak to you in person or by phone?

4        A.    By phone.

5        Q.    And what do you recall of that conversation?

6        A.    The only thing I remember was advising him that

7    he can get -- as her attorney he can get a court order to

8    release the vehicle to her. So he must have been asking

9    about her not paying fees or not wanting to.

10        Q.    Okay. With respect to this document, it's

11    called "Post-Tow Hearing Request and Report," correct?

12        A.    Yes.

13        Q.    So to the best of your recollection, Disenia

14    Cancel requested a hearing on February the 6th, 2008?

15        A.    Yes.

16        Q.    Did she already have her car back then? Do you

17    know?

18        A.    No.

19        Q.    And when she requested this hearing, was she

20    there or was it on the phone?

21        A.    It was on the phone.

22        Q.    And did she talk to someone before you during

23    that phone call? Like, did somebody else pick up the

24    phone and then transfer it to you?

48

1     A.   I don't recall.

2     Q.   What do you recall her saying before the

3 hearing started?

4     A.   That she wanted her car out and didn't believe

5 she should have to pay, that she wanted a hearing.  And I

6 would have told her the hearing was just to -- whether

7 the tow was justified or not.

8     Q.   Okay.

9     A.   And in this case, I told her the tow was

10 justified because the person driving did not have a

11 license; it was revoked for a DUI.  And I asked her if

12 she knew that.  And she said yes, that she was

13 lightheaded and wanted him to take her to the hospital.

14     Q.   Okay.

15     A.   I told her I could give her the hearing over

16 the phone.  We try to do it informally so that people

17 aren't inconvenienced by having to take off of work or

18 having to come drive down there, that we can do it

19 informally if they so choose.

20     Q.   And if they said no, we want to do it formally,

21 then how would it be done?

22     A.   I would tell them they can come down any time

23 between 7:00 a.m. and 2:30 p.m. Monday through Friday

24 excluding holidays.

49

1    Q.   Do they have to make an appointment?

2    A.   No.

3    Q.   So if they came there and said they wanted to

4    have a hearing, as long as they showed up during working

5    hours, they could have the hearing?

6    A.   Yes.

7    Q.   Provided the hold was released?

8    A.   Yes.

9    Q.   Okay.  Now, if you showed up in person and said

10   you wanted to have a hearing, how would the hearing

11   proceed?

12   A.   They would either sit on a chair or stand near

13   our desk, and we would ask them questions.

14   Q.   Okay.  Is there -- I take it there's not a

15   court reporter present?

16   A.   No.

17   Q.   Is it tape-recorded?

18   A.   No.

19   Q.   Is there any form of recording of this hearing

20   other than the notes prepared by the hearing officer?

21   A.   No.

22   Q.   Is the police officer ever present?

23   A.   The police officer is the one -- Excuse me.  I

24   don't understand --

1  Q.  The police officer who seized the car in the

2  first place?

3  A.  No.

4  Q.  So if the officer is not present, how do you

5  know if it was a valid tow?

6  A.  By the documents that are returned to us from

7  the officer that towed the vehicle.

8  Q.  Okay.  So the hearing couldn't proceed until

9  you at least had those documents, correct?

10  A.  Yes.

11  Q.  So if the police officer's arrest report or tow

12  report is not in your possession, you can't have a

13  hearing?

14  A.  Correct.

15  Q.  Once the police officer's reports are in your

16  possession and the hold is off, you can have a hearing?

17  A.  Yes.

18  MS. JACKSON:  I just want to clarify.  We're still

19  only talking about --

20  MR. PETERS:  Only Article 36.

21  BY MR. PETERS:

22  Q.  So would -- Is it correct then that you read

23  the police officer's account of why the car was stopped,

24  seized, and impounded?

1    A.    Yes.

2    Q.    Is that typically in an arrest report or just a

3    tow report?

4    A.    Tow report.

5    MR. PETERS:  I don't have extras of this.  I can go

6    make some.

7    Could you just make like three of these?

8    MS. JACKSON:  I've got them.

9    MR. PETERS:  Oh, you do.  All right.

10    We'll mark this Exhibit No. 3.

11    (Hadac Deposition Exhibit No. 3

12    marked as requested.)

13    BY MR. PETERS:

14    Q.    Is -- First of all, do you recognize what

15    Exhibit No. 3 is?

16    A.    Yes.

17    Q.    What is this?

18    A.    The motor vehicle inventory report that was

19    prepared for vehicle inventoried under 440520.

20    Q.    And is that the car that's owned by Disenia

21    Cancel as far as you can tell?

22    A.    Just by looking at this paper, I wouldn't be

23    able to tell you that.

24    Q.    Okay.  Is this the kind of report that you rely

1    on when you do these hearings?

2        A.    No.

3        Q.    There's a more detailed report?

4        A.    This is just the inventory of the vehicle that

5    was towed into the pound.

6        Q.    Okay.

7    MR. PETERS:  Do we have the other report?

8    MS. JACKSON:  I messengered a stack of documents to

9    you on Monday that you should have received.

10   MR. PETERS:  Yeah, I have a stack of documents.  So

11   it's in there?

12   MS. JACKSON:  It's in there.

13   BY MR. PETERS:

14       Q.    Once you receive the officer's report and a

15   person wants a hearing, you do read the reports, correct?

16       A.    Yes.

17       Q.    Are any of the reports to your knowledge under

18   oath?

19       A.    No.

20       Q.    Once you read the report, do you ever call the

21   officer?

22       A.    No.

23       Q.    To your knowledge, do the other people who

24   perform these hearings ever call the officer?  Have you

1    ever heard of that happening?

2        A.   No.  Because they are official police documents

3    and everything that's normally needed is in there.

4        Q.   So would it be correct to say that you as a

5    hearing officer assume that what's in the police report

6    is true and accurate?

7        A.   Yes.

8        Q.   And that is always the assumption?

9        A.   Yes.

10       Q.   Is there anything that the owner can do to

11   rebut that assumption?

12       A.   Yes.

13       Q.   What would that be?

14       A.   I mean, they could tell us that they didn't

15   agree with it.

16       Q.   And then what happens?

17       A.   We tell them to contact the detective that's

18   handling the case.  Because normally the officer ...

19       Q.   Let me give you a scenario.  Okay?

20       A.   Okay.

21       Q.   You have a couple of times said that these

22   hearings at least generally relate to people who are

23   driving on a suspended license because of a DUI, correct?

24       A.   Yes.

1    take to someone else?

2        MS. JACKSON:  Objection as to form.

3    BY THE WITNESS:

4        A.   Yes.

5        Q.   And has that -- I'm not saying exactly like

6    that.  Have mitigating circumstances sufficient to

7    warrant you to go to the chief ever occurred?

8        A.   For Article 36 vehicles, no.

9        Q.   Okay.  Is there some CPD order or directive

10   that either allows you to consider mitigating

11   circumstances or disallows that?

12       A.   I've not seen anything in writing.

13       Q.   Okay.  With respect to Exhibit No. 2, the

14   post-tow hearing report, did you prepare this on the day

15   of the hearing, February the 6th?

16       A.   Yes.

17       Q.   Okay.  And this occurred at around 8:30 in the

18   morning?

19       A.   Yes.

20       Q.   Okay.  Then would you go back to No. 3?

21   There's some handwriting at the top of Exhibit No. 3?

22       A.   Yes.

23       Q.   Do you recognize whose handwriting that is?

24       A.   Yes.

1    seized?

2        A.    Yes.

3        Q.    Do you remember if you had all the paperwork

4    then?

5        A.    I did not.

6        Q.    So as of that date, with respect to this car,

7    there couldn't be a post-tow hearing?

8        A.    Correct.

9        Q.    And then below -- or just to the right of where

10   the name Robert Cotter is written, there's a phone

11   number, (773) 405-6153?

12       A.    Yes.

13       Q.    Whose phone number is that?

14       A.    I believe that's the attorney's number.

15       Q.    Okay.  So he left his phone number.  Do you

16   remember why he left his phone number?

17       A.    No.

18       Q.    And then going farther to the right, there

19   is -- it looks like 2/27.  And then I'm not sure what it

20   says.  It looks like EXTHP hold.  What does that mean?

21       A.    That means on February 27th it was placed on

22   extended hold, and HP is the person in the operational

23   trailer who was given that information to make sure the

24   vehicle is on extended hold and not released.

1    Q.   Do you think that that's a --

2    A.   Because if it's not picked up within 30 days,

3  it's eligible to be crushed.

4    Q.   Okay.  So the point of that notation is to

5  prevent it from being crushed?

6    A.   Yes.

7    Q.   And did you write that, or did someone --

8    A.   Yes.

9    Q.   Okay.  So this vehicle is right now on extended

10  hold?

11    A.   Yes.

12    Q.   When Miss Cancel called and she had her

13  hearing, did she discuss at all her ability to pay for

14  the car?

15    A.   No.

16    Q.   Did you ask her anything about, "Well, are you

17  going to come get it" or "Can you afford it"?  Did that

18  come up?

19    A.   No.

20    Q.   Okay.  I'll give you what we'll mark as Exhibit

21  No. 4?

22    MS. JACKSON:  It's the same thing.

23    MR. PETERS:  Oh, I'm sorry.  I meant to give you --

24          I gave you the right thing.

1          This is what I meant to give you.

2          All right.  Could you make two copies of this

3    because I think I double-copied the previous one.

4          THE WITNESS:  Are these my copies to keep?

5          MR. PETERS:  Sure.

6                              (A short break was had.)

7                              (Hadac Deposition Exhibit No. 4

8                              marked as requested and rescinded.)

9    BY MR. PETERS:

10         Q.    If a car is seized and impounded pursuant to

11   Article 36 for traffic related, a hearing can be held if

12   the owner requests one, correct, after the hold has been

13   released?

14         A.    Yes.

15         Q.    And assuming that you have all of the necessary

16   CPD paperwork already in your possession, correct?

17         A.    Yes.

18         Q.    If the owner doesn't specifically request a

19   hearing, then there is no hearing?

20         A.    Yes.

21         Q.    And the first written notice that is sent to

22   them advising them of their right to a hearing occurs

23   after the hold has been released?

24         A.    Yes.

1    Q.    Okay.  After the sheriff has said he is not

2  going to pursue forfeiture?

3    A.    Yes.  Or if documents weren't received from the

4  officer.

5    Q.    Within 30 days?

6    A.    Within 30 days.

7    Q.    Okay.  This particular exhibit again refers to

8  Disenia Cancel, correct?

9    A.    Yes.

10    Q.    And it refers to the same date of tow,

11  January 4, 2008?

12    A.    Yes.

13    Q.    And was this document mailed on -- or prepared

14  on February the 6th, 2008?

15    A.    Yes.

16    Q.    And then after it was prepared, it would be

17  left for pick up to be mailed from the headquarters; is

18  that correct?

19    A.    It would be placed into the operational trailer

20  where it's picked up once daily in the morning.

21    Q.    And when it's picked up daily in the morning,

22  does it follow the same course as the previous exhibit,

23  that it's taken to 35th and Michigan for mailing by the

24  mail unit?

A.   Yes.

Q.   So with respect to Disenia Cancel, she happened to call on February the 6th, 2008, because you gave her a hearing that day, correct?

A.   Yes.

Q.   That was the same date that this Exhibit No. 4 was prepared but probably had not been mailed yet?

A.   Correct.

Q.   Okay.  With respect to this Exhibit No. 4, do you know what happens if it's mailed and it's returned as undelivered or nondeliverable?

A.   It's placed in a file.

Q.   Does it come back to your location?

A.   Yes.

Q.   And it's placed in the same file that you previously had been maintaining on the car?

A.   No.  It's in a separate file for all returned mail.

Q.   For returned mail.  And is there any effort made then to renotify the vehicle owner?

A.   We can only go by the address we have.  If we have nothing else, we can't make up one.

Q.   Okay.  Well, for example, do you ever check the jail to see if that person happens to be incarcerated?

1     A.   No.

2     Q.   Is this same notice sent in nontraffic

3  Article 36 cases?

4     A.   If a hold is taken off of a vehicle regardless

5  of what it was brought into the pound for, this is the

6  notice that would be sent that the hold was removed.

7     Q.   Okay.  With respect to Article 36 nontraffic --

8  excuse me -- traffic cases, what's your experience as to

9  how often the sheriff declines to seek forfeiture?

10    A.   Maybe one out of three.

11    Q.   And do you have a sense of how often he

12  declines in nontraffic cases?

13    A.   No.

14    Q.   You haven't really been involved much with

15  nontraffic Article 36 hearings; is that fair to say?

16    A.   Most hearings are by the hearing officer, so I

17  would have very few.

18    Q.   Very few that are for nontraffic?

19    A.   Yes.

20    Q.   Well, very few in general.  But of the ones

21  you've done, do you do more that are traffic than

22  nontraffic?

23    A.   No.

24    Q.   More that are nontraffic?

1    A.   There's more vehicles that are nontraffic than

2  traffic.

3    Q.   Okay.  With respect to the nontraffic

4  Article 36 holds, are there officers present for those

5  hearings?

6    A.   Could you clarify that?

7    Q.   Well, you used, I think, previously an example

8  of a person arrested for a burglary, correct?

9    A.   Mm-hmm.

10    Q.   So I take it that would mean that the person

11  was arrested for a burglary and maybe allegedly had the

12  property in the car at the time he was arrested, correct?

13    A.   Yes.

14    Q.   That might be grounds for an Article 36

15  forfeiture of the car, correct?

16    A.   Yes.

17    Q.   So in traffic-related cases, you go by the

18  report and you can check with LEADS, correct?

19    A.   Yes.

20    Q.   And in nontraffic-related cases, do you also

21  rely on the arrest report and the tow report?

22    A.   Yes.  But there's also a towed vehicle

23  disposition form that's included with all that paperwork.

24    Q.   Okay.

1      A.    And that spells it out a little more in the

2  narrative as to why the vehicles were towed.

3      Q.    Okay.  In nontraffic Article 36 cases, are you

4  aware of any hearings that -- at which the officer or an

5  officer was present and testified?

6      A.    Can you clarify what officer?  I don't

7  understand.

8      Q.    The arresting officer?

9      A.    No, they are not there.

10     Q.    They're not there.  So in nontraffic cases, you

11  rely on the reports just as you do in traffic cases?

12     A.    Yes.

13     Q.    And in nontraffic Article 36 cases, are

14  there -- Well, let me ask a different question.  In

15  nontraffic Article 36 cases, you have the report saying

16  why the officer made the stop and his explanation of the

17  grounds for seizing the car, correct?

18     A.    Yes.

19     Q.    And let's suppose that the owner comes in and

20  says, "You know what?  My case was thrown out, no finding

21  and no probable cause."  Then how does the hearing

22  officer handle that?

23     A.    They're normally told that "the case is over.

24  You'll will have to pay towing and storage fees.  If you

1    choose not to, go back to the judge that heard your case

2    and get a court order from him ordering us to give you

3    the vehicle for no fees."

4        Q.   Okay.  Well, would a finding of no probable

5    cause in the criminal case mean to you that the original

6    seizure and tow were unfounded?

7        A.   If we got that in writing.

8        Q.   From whom?

9        A.   From the judge.  We would have no idea knowing

10   that that was -- We don't hear what the outcome of the

11   cases are.

12       Q.   Okay.

13       A.   If the owner of the vehicle has only given us a

14   verbal say that, you know, the case was thrown out, I

15   tell them, "Call back, talk to the detective.  Have him

16   give us a towed vehicle disposition form telling us that,

17   that there was no probable cause and the vehicle should

18   be released to you for no fees, or get a court order."

19       Q.   So in the case of an Article 36 nontraffic tow,

20   the fact that the owner was found not guilty or there was

21   no probable cause at the preliminary hearing does not by

22   itself result him getting his car back for no fees?

23       A.   For the owner telling us -- just verbally

24   telling us that, no.

1    car for no fees?

2        A.   Yes.

3        Q.   So if the court proceeding was just not guilty

4    but no other reference to the car, that wouldn't be

5    enough?

6        A.   No.

7        Q.   And if the court proceeding was finding of no

8    probable cause, no reference to the car, that also would

9    not be enough for you to waive the towing and storage

10   costs?

11       A.   Correct.

12       Q.   And that's your personal view of this, correct?

13       A.   That's our policy.

14       Q.   That's your policy.  So that applies not just

15   to you but anybody who does hearings?

16       A.   Correct.

17       Q.   And that's been true as long as you've been

18   doing these hearings?

19       A.   Correct.

20       Q.   As far as you're concerned?

21       A.   Yes.

22       Q.   To your knowledge, if a person is dissatisfied

23   with the results of your Article 36 hearing, are they

24   advised of some procedure for appealing your ruling?

A.    Yes.

Q.    Is this advice given to them orally or in writing?

A.    Orally.

Q.    What are they told?

A.    They were told that they can get a court order or they could go down to a City office to appeal the hearing.

Q.    What's -- Okay.

A.    I don't have that information with me.

Q.    So what do you tell them?  You just say you can go to a City office?

A.    No.  I have the information on it written at my desk.

Q.    Okay.  So you don't remember specifically where you tell them they can go, but you tell them they can go someplace to appeal this?

A.    Yes.  It's an address on -- It's an address in the City.

Q.    Okay.  But they are not like handed a piece of paper or a card saying, "You have a right to appeal this within X number of days.  Go to this location to do that"?

A.    No.

1    Q.   You tell them they can go to a certain

2    location?

3    A.   Yes.

4    Q.   Do you tell them how long they have to go there

5    to do this appeal?

6    A.   I believe it's within 15 days, is what I was

7    told.

8    Q.   Okay.  Do you tell this to every person who has

9    a hearing or just if they ask?

10   A.   Just if they ask.  If they are not happy with

11   the outcome, then they -- Normally, every person who is

12   not happy with the outcome asks.

13   Q.   Okay.  Is any person ever happy with the

14   outcome?

15   A.   They understand it, yes, that this was a valid

16   tow because they're "Okay."

17   Q.   Okay.  With respect to Disenia, were you at any

18   time aware that her vehicle was towed twice for the same

19   incident?

20   A.   After looking through the file, I understand

21   that it was towed to a police district parking lot and

22   removed from there without the police authority and then

23   it was towed again.

24   Q.   What information -- You think that it was

75

1    A.   Yes.

2    Q.   What in general is Exhibit No. 5?

3    A.   This looks to be a receipt for a vehicle

4    released from a Streets and Sanitation pound.

5    Q.   And does it appear that it relates to Disenia

6    Cancel?

7    A.   Yes.

8    Q.   And that the date is January the 4th, 2008?

9    A.   I can't make that out, if that's it or not.

10   Q.   Okay.  You can see that it's stamped

11   "released"?

12   A.   Yes.

13   Q.   And it's on a City of Chicago form?

14   A.   Yes.

15   Q.   So if you had known that she had paid twice,

16   would that have affected the Article 36 hearing that you

17   conducted?

18   A.   Nope.  Because this is from a Streets and

19   Sanitation pound and the cars towed there are not for any

20   police investigation.  It's generally for a parking

21   violation or something of that sort.  It's not anything

22   that has a police investigation.

23   Q.   Are you aware that the City of Chicago has

24   certain ordinances which authorize the impoundment of

1   vehicles?

2       A.   Yes.

3       Q.   And are you aware that some of those ordinances

4   authorize the City to hold the vehicle unless certain

5   charges are paid?

6       A.   Yes.

7       Q.   And are you aware that some of those ordinances

8   allow the City to impose a fine to get the car back?

9       A.   Yes.

10      Q.   If -- So can you tell whether from what you

11  know from Disenia Cancel's file and from this release

12  whether her car was towed for a City ordinance violation

13  and she paid to have it released?

14      A.   I have no idea what it was towed for.  I can't

15  tell from this.

16      Q.   If it had been towed for a City ordinance

17  violation and she paid the release fees and then it was

18  towed for exactly the same conduct but pursuant to

19  Article 36, would that affect how you would resolve the

20  tow hearing?

21      A.   No.

22      Q.   And why is that?

23      A.   Because vehicles towed -- we have no

24  jurisdiction over vehicles towed to another pound and

1    Q.   Okay.  All right.  Let me just look at a few

2    things here.

3         Do you know that some cars can be held for

4    investigation?

5    A.   Yes.

6    Q.   And are cars that are held for investigation

7    sometimes towed to your facility?

8    A.   All cars held for investigation are towed to

9    our facility.

10   Q.   Okay.  And when they are held for

11   investigation, are they handled any differently than the

12   procedure you've described for Disenia Cancel's vehicle?

13   A.   Vehicles towed for Article 36 are treated

14   differently from vehicles towed for hold for

15   investigation because those vehicles are eligible to be

16   released on the eleventh day unless the detective or

17   whoever is in charge of that investigation releases the

18   hold earlier or may extend the hold.

19   Q.   Okay.  With respect to vehicles that are held

20   for investigation, they can be released after the tenth

21   day?

22   A.   If there's not an extended hold, yes.

23   Q.   Who can put an extended hold on them?

24   A.   The investigator.

1    A.    Yes.

2    Q.    Other than getting a release from the detective

3    or investigating officer, can anyone else release the

4    vehicle without charges?

5    A.    The chief.

6    Q.    The chief at your facility?

7    A.    Yes, Chief Kudulis, K U D L I S.

8    Q.    Can -- Other than those two people being able

9    to release them, can the owner have a hearing saying,

10   "You know, you shouldn't have my car.  I didn't do

11   anything wrong"?

12   A.    Yes.  But we tell them at that time they need

13   to contact the investigator because we have no idea what

14   the circumstances were with regards to the vehicle being

15   towed.  And that investigator has to give us a document

16   called a towed vehicle disposition form letting us know

17   what the circumstances were.

18   Q.    So after the owner of a car that's in the pound

19   for hold for investigation purposes calls, he or she is

20   instructed to get in touch with the investigating officer

21   first of all, correct?

22   A.    Yes.

23   Q.    Now, suppose the investigating officer provides

24   you with the report as to why the car is being held for

1    investigation, can the owner then get a hearing from you

2    within 10 days?

3         A.   Yes.

4         Q.   And how is that hearing conducted?  Is it

5    different than the one you've described?

6         A.   No.

7         Q.   Is the officer ever present for the hearing,

8    the investigating officer as opposed to the hearing

9    officer?

10        A.   No.  His documents suffice.

11        Q.   And that is regardless of the nature of the

12   investigation?

13        A.   Yes.

14        Q.   Whether it was for bank fraud or murder or

15   smoking marijuana in the car?

16        A.   We don't handle drug ones.  We do not do drug

17   cars.

18        Q.   Bank fraud or murder?

19        A.   Yes.

20        Q.   It makes no difference?

21        A.   No.

22        Q.   And it would -- At this hearing, if one were to

23   be held, the owner could be present, correct?

24        A.   Yes.

1    Q.    By phone or at your location?

2    A.    Correct.

3    Q.    And if the owner came in and said, "I didn't do

4    it. And here are my five witnesses who say I didn't do

5    it," the officer would not be present, correct?

6    A.    Correct.

7    Q.    Then how would you decide what to do in those

8    circumstances? Is the report always presumed to be true?

9    A.    Yes. Those are official documents, so we

10    presume those to be correct. And if he had five

11    witnesses with him, I would tell him to bring those

12    witnesses with him to the investigator.

13    Q.    To the investigator?

14    A.    Yes.

15    Q.    But that's not really a hearing, correct?

16    That's a question of the investigator's discretion, "I'll

17    give it back or I won't"?

18    A.    The investigator doesn't have the authority to

19    tell them that they can get the car back for no fees.

20    All he can do is tell them that he would put in the

21    narrative of the towed vehicle disposition form the

22    reasons that he's requesting the vehicle to be released

23    to the owner for no charges or for a reduced charge.

24    And, ultimately, Chief Kudulis is the only one that has

1        A.    Mm-hmm.

2        Q.    Suppose we have a burglary with the same

3    scenario.  Then the only way the car could be released no

4    matter how many witness the owner had is for the

5    investigating officer, slash, detective to say, "Okay.  A

6    mistake was made.  I'll release the vehicle and give you

7    that form"?

8        A.    Yes.

9        MS. JACKSON:  Objection as to form.

10   BY THE WITNESS:

11       A.    If a detective gives a towed vehicle

12   disposition form telling us that the vehicle should not

13   have been towed and requesting the fees to be waived,

14   yes, we would do that.

15       Q.    And that's the only way you would do it within

16   those first 10 days?

17       A.    If he's telling us the investigation is

18   complete, release the car earlier, it was towed in error,

19   the vehicle would be returned to the owner that day for

20   no fees.

21       Q.    Yes.  But that is the only way that that's

22   going to happen within those 10 days.  The fact that the

23   owner showed up with his witnesses and said, "I didn't do

24   it.  Here are the people who say I didn't do it," that

IN THE
UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| DISENIA CANCEL and ISMAEL CANCEL, | ) |
| | ) |
| Plaintiff, | ) |
| | ) No. 08 C 951 |
| v. | ) |
| | ) |
| CITY OF CHICAGO and JODY WEIS, | ) Honorable Milton Shadur, |
| SUPERINTENDENT of POLICE, | ) Presiding |
| Defendants | ) |

## EXHIBIT 2 IN SUPPORT OF PRELIMINARY INJUNCTION

1

Richard M. Daley
Mayor

**Department of Police * City of Chicago**
650 W. 83rd Street · Chicago, Illinois 60620

Philip J. Cline
Superintendent of Police

**440520**
° DISENIA CANCEL
4317 W. CRYSTAL
**CHICAGO IL 60651**

°

**Date:** 07 JAN. 2008

**Inventory No:** 440520
**Make of Vehicle:** 95 DODG 4D
**V.I.N.:** 1B3EJS6HXSN545336
**Date Towed:** 04 JAN 08

**Pound Location: 650 W. 83rd St.**

### VEHICLE ON HOLD

# If you no longer have any interest in the vehicle please disregard this letter.

This is to advise you that the motor vehicle described above has been impounded at the Police Auto Pound indicated and is being held for investigation and/or pursuant to the provisions of Article 36, Chapter 38, I.R.S [720 ILCS 5/36-1]., whereby it may be subject to seizure and turned over to the Cook County Sheriff for disposal.

In the event that you have an interest in this vehicle, are innocently involved and wish to obtain possession, you may call the Article Officer at (312) 747-0941 Should the "HOLD" be released you will be notified by mail, and you will have to furnish proof of ownership or interest in the vehicle. The registered owner must present a certificate of title or state license registration card. Any agent or relative requesting property must have a notarized letter from the registered owner.

A lien holder must provide a photostatic copy of the conditional sales agreement and the title, a letter stating that the purchaser is in default of the agreement and authorize a named individual to execute an indemnification certificate in the Automotive Pounds Headquarters Section office, 650 W. 83rd Street, Chicago. A lien holder may redeem the vehicle after the registered owner(s) have failed to do so within 15 days.

Charges include $150 for vehicle under 8,000 pounds, $250 for vehicle over 8,000 pounds, plus $10 per calendar day (1st 5 days, then $35 per day) for storage of vehicle under 8,000 pounds or $60 per calendar day (1st 5 days, then $100 per day) for vehicle over 8,000 pounds in accordance with the provisions of the Municipal Code of Chicago (9-92-80 M.C.C).

Towing and storage charges are accruing and must be paid in cash at the Auto Pound at the time of release.

Commanding Officer
Automotive Pounds Section
(312) 747-0941

CDP-34.302-A(REV.12/04

IN THE
UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

DISENIA CANCEL and ISMAEL CANCEL,    )
    )
    Plaintiff,    )
    )  No. 08 C 951
    v.    )
    )
CITY OF CHICAGO and JODY WEIS,    ) Honorable Milton Shadur,
SUPERINTENDENT of POLICE,    ) Presiding
    Defendants    )

## EXHIBIT 3 IN SUPPORT OF PRELIMINARY INJUNCTION

1



| Richard M. Daley<br>Mayor | Department of Police · City of Chicago<br>650 W. 83rd Street · Chicago, Illinois 60620 | Jody P. Weis<br>Superintendent of Police |

**440520**

○ DISENIA CANCEL
4317 W. CRYSTAL
CHICAGO, IL 60651

○

**Date:** 06 FEB. 2008

**Inventory No:** 440520

**Make of Vehicle:** 95 DODG 4D

**V.I.N:** 1B3EJS6JIXSN545336

**Date Towed:** 04 JAN 08

**Pound Location:** 650 W. 83rd St.

## If you no longer have any interest in the vehicle please disregard this letter.

REGISTERED OWNER

The **HOLD ORDER** on the above captioned vehicle has been **REMOVED**. Vehicles may be redeemed from the Automotive Pound twenty-four hours a day, including Saturdays, Sundays and holidays.

To retrieve this vehicle the registered owner must present a certificate of title or state license registration card. Any person seeking a release of the vehicle on behalf of the owner must furnish written and notarized approval of the owner.

No operative vehicle will be released without current state and city licenses.

You are also entitled to a hearing, within 15 days after notification, if you desire, to determine the validity of the tow and any towing or storage charges. You may obtain this information or arrange for a hearing by contacting the Automotive Pounds Section at the telephone number (312) 747-0941, between the hours of 7:00 A.M. and 2:30 P.M., Monday through Friday, except holidays.

Towing and storage charges must be paid in cash at the Automotive Pound. Checks or money orders are not acceptable. Pursuant to the Municipal Code of Chicago (9-92-80 (b) M.C.C.), such charges are as follows:

     TOWING:    $150 for vehicle under 8,000 pounds; $250 for vehicle over 8,000 pounds.

     STORAGE:    $10 per day (1st 5 days then $35 per day) for vehicle under 8,000 pounds; $60 per day (1st 5 days then $100 per day) for vehicle over 8,000 pounds.

Your failure to contact this office or reclaim this vehicle within 15 days will constitute a waiver of all interest and this vehicle will be disposed of as scrap or sold at auction.

LIEN HOLDER

A lien holder must provide a photostatic copy of the conditional sales agreement and title, a letter stating that the purchaser is in default of the agreement, and authorize a named individual to execute an indemnification certificate in the Automotive Pounds Section office, 650 W. 83rd Street, Chicago.

                     Commanding Officer
                     Automotive Pounds Section
                     Chicago Police Department
                     (312) 747-0941

CPD-34.303 (REV.12/04)

Emergency: 9-1-1 · Non-Emergency: (Within City limits) 3-1-1 · Non-Emergency: (Outside City limits) 312-746-6000
TTY: 312-746-9715 · E-mail: police@ci.chi.il.us · Website: www.ci.chi.il.us/CAPS

CITY000086